UNITED STATES of America,
Plaintiff–Appellee,

v.

Gerald Frank PLUNK, Defendant–
Appellant.

No. 96–30363.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 2, 1998.

Decided Aug. 28, 1998.

Phillip Paul Weidner, Phillip Paul Weidner & Associates, Inc., Anchorage, Alaska, for the defendant-appellant.

Daniel S. Goodman, United States Department of Justice, Washington, D.C., for the plaintiff-appellee.

Before BROWNING, SKOPIL, and O'SCANNLAIN, Circuit Judges.

O'SCANNLAIN, Circuit Judge.

We review challenges to convictions and a sentence on various counts which arose out of a coast-to-coast cocaine smuggling conspiracy.

## I

During the late 1970s and the 1980s, Gerald Frank Plunk was a relatively small-time cocaine dealer in Anchorage, Alaska. He was supplied throughout the 1980s by Barry Tendler, a pilot from Florida. Tendler, in turn, received his cocaine from a man named Michael. Michael was involved directly with Colombia's Cali Cartel, and had been entrusted with the responsibility of discovering a new way to smuggle cocaine into the United States. When told of Michael's charge, Plunk expressed his interest in participating. At Michael's behest, both Tendler and Plunk met him in Aruba in September 1992 to discuss possible smuggling arrangements. After a second Aruba rendezvous, Plunk was summoned to Colombia to meet personally with several high-ranking members of the Cali Cartel.

At the meeting in Colombia, Plunk was asked to coordinate the transportation of cocaine from Los Angeles and Houston to the New York City metropolitan area. He was placed in charge of a project that involved the cross-country transportation of cocaine in recreational vehicles. Plunk contacted and hired a number of drivers to move the cocaine across the country. Plunk's drivers successfully completed approximately eighteen drug runs, each of which resulted in the transportation of roughly 200 kilograms of cocaine.

Simultaneously with his motorhome project, Plunk and three of his co-conspirators coordinated the coast-to-coast transportation of cocaine inside produce trucks. The scheme entailed shipping the drugs inside vacuum-sealed bags, which were then placed inside crates of onions and other vegetables to avoid detection. Plunk successfully directed six or seven of these produce-truck hauls. On each occasion, the trucks carried between 200 and 250 kilograms of cocaine.

In December 1993, an independent narcotics investigation by New Jersey State Police uncovered $380,000 cash and a heat-sealing machine traceable to Plunk. A New York state court subsequently authorized a wiretap of several Colombians suspected of narcotics trafficking. Investigators concluded that the monitored telephone conversations suggested the existence of a large-scale conspiracy to transport cocaine across the United States. They also discovered that a number of calls were placed from a number registered to Plunk. During a monitored conversation on December 10, Plunk mentioned that Hal Booher—one of his drivers, who was attempting to deliver a shipment of cocaine to New Jersey—would be replacing his Alaska license plates with Pennsylvania tags. That same day, a federal district court in Alaska authorized a tap of Plunk's cellular telephone. The agents determined that Plunk had called Booher at a number in Carlisle, Pennsylvania. The next day, the agents stopped Booher in New Jersey and questioned him. Booher consented to a search of the motorhome, which revealed 220 kilograms of cocaine. Booher implicated Plunk as his employer.

A subsequent search of Plunk's Alaska residence uncovered additional incriminating evidence, including several firearms, a scale, and nearly $10,000 in cash. Plunk surrendered himself to Drug Enforcement Administration ("DEA") authorities, and was arrested on March 25, 1994. A month later, Plunk was indicted in federal court on ten separate drug-related counts: two counts of conspiring to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846; one count of maintaining a continuing criminal enterprise ("CCE") in violation of 21 U.S.C. § 848; four counts of using a communication facility in violation of 21 U.S.C. § 843(b); and three counts of possessing cocaine with intent to

distribute in violation of 21 U.S.C. § 841(a)(1).

A jury found Plunk guilty on one count of conspiracy, four counts of using a communication facility, and one count of possession with intent to distribute. It acquitted him on one count of possession with intent to distribute, and hung on one count of conspiracy, one count of CCE, and one count of possession with intent to distribute. Plunk was sentenced to life imprisonment.

Employing what might be described as a scatter-shot strategy, Plunk challenged his convictions and sentence on thirteen separate fronts. We address five of Plunk's claims in an unpublished disposition filed contemporaneously herewith. The balance of Plunk's arguments are as follows:

(1) the district court erred in permitting a veteran narcotics officer to testify as an expert regarding the meaning of certain code words and jargon used by Plunk and his co-conspirators in consummating drug transactions;

(2) the district court erred in denying his motion to suppress the fruits of an administrative subpoena;

(3) the district court erred in refusing to suppress voice and photographic identifications by a co-conspirator and a voice identification by a narcotics detective;

(4) the district court committed reversible error in refusing to grant a mistrial in the wake of a security officer's brief comment to a juror and the judge's secretary's decision to furnish the jury with a dictionary;

(5) the district court erred in allowing the jury to view transcripts of tape recorded conversations between Plunk and his co-conspirators during deliberations;

(6) the district court committed reversible error by administering an *Allen* charge;

(7) the government violated its obligations under *Brady v. Maryland* by failing to search for and to provide Plunk's counsel with handwritten notes allegedly contained in the files of the federal public defender; and

(8) the Double Jeopardy Clause barred the government from prosecuting him because it had previously conducted civil forfeiture proceedings against items of his property.

We have jurisdiction over Plunk's appeal pursuant to 28 U.S.C. § 1291. We address Plunk's contentions in turn.

## II

During its case-in-chief, the government called Detective Jerry Speziale of the New York City Police Department to testify as an expert witness "in the field of narcotics trafficking, including wiretapping investigations, analysis of codes, words, and reference[s] used by narcotics traffickers." Speziale testified as to the general usage of cryptic terminology by drug dealers, and interpreted for the jury various encoded conversations between Plunk and his co-conspirators. On appeal, Plunk challenges the admission of Speziale's testimony under Federal Rules of Evidence 702, 704, and 403.

### A

■ As a threshold matter, Plunk objects that Detective Speziale should not have been allowed to testify as an expert at all. Plunk contends that Detective Speziale's testimony was improperly admitted under the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), because it lacked the requisite "scientific basis." In *Daubert*, the Supreme Court concluded that Federal Rule of Evidence 702[1] had superseded the "general acceptance" test for novel scientific evidence, first articulated in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923). The *Daubert* Court held that in order to be admissible under Rule 702, scientific evidence had to be "derived by the scientific method" and of some assistance to the factfinder in determining a fact in issue. *See Daubert*, 509 U.S. at 590–93, 113 S.Ct. 2786. The Court went on to suggest a few criteria to guide lower courts' decisions whether to admit scientific testimony: (1) whether the particular theory or technique could be tested;

---

1. Rule 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Fed.R.Evid. 702.

(2) whether the theory or technique presented had been subjected to peer review; (3) whether the theory or technique had a relatively low rate of error; and (4) whether the theory or technique had gained general acceptance in the relevant scientific community. *See id.* at 593–94, 113 S.Ct. 2786.

▮ Plunk maintains that Speziale's allegedly expert knowledge of narcotics code terminology does not meet the *Daubert* standard and is, consequently, inadmissible. The unarticulated premise of Plunk's argument, however—that *Daubert* analysis applies to testimony such as that offered by Speziale—is incorrect. It is settled in this circuit that "*Daubert* is confined to the evaluation of 'scientific' expert testimony." *McKendall v. Crown Control Corp.*, 122 F.3d 803, 806 (9th Cir.1997). Consequently, because Speziale's testimony "constitutes specialized knowledge of law enforcement, not scientific knowledge, the *Daubert* standards for admission simply do not apply." *United States v. Webb*, 115 F.3d 711, 716 (9th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 429, 139 L.Ed.2d 329 (1997); *accord United States v. Cordoba*, 104 F.3d 225, 230 (9th Cir.1997).[2] Rather, courts evaluating the admissibility of "technical" or "specialized" knowledge such as Speziale's must conduct a more traditional Rule 702 analysis and determine, first, whether or not the content of the proposed opinion constitutes a proper subject of expert testimony (*i.e.,* "technical[ ] or other specialized knowledge [that] will assist the trier of fact to understand the evidence or to determine a fact in issue," Fed.R.Evid. 702), and second, whether or not the proposed witness possesses the requisite qualifications (*i.e.,* "knowledge, skill, experience, training, or education," *id.*) in his claimed area of expertise. *See McKendall*, 122 F.3d at 806.

We cannot doubt that Detective Speziale's testimony concerned a proper subject of expert testimony. Ninth Circuit precedent makes clear that, as a general proposition, "[l]aw enforcement officers with sufficient qualifications may testify concerning the methods and techniques employed in an area of criminal activity." *United States v. Espi-*

*nosa,* 827 F.2d 604, 612 (9th Cir.1987); *accord United States v. Kearns,* 61 F.3d 1422, 1427 (9th Cir.1995). More specifically, the jargon of the narcotics trade and the codes that drug dealers often use constitute specialized bodies of knowledge—certainly beyond the ken of the average juror—and are therefore proper subjects of expert opinion. *See United States v. Griffith,* 118 F.3d 318, 321 (5th Cir.1997); *United States v. Delpit,* 94 F.3d 1134, 1145 (8th Cir.1996); *United States v. Quintana,* 70 F.3d 1167, 1170–71 (10th Cir.1995); *United States v.. Boissoneault,* 926 F.2d 230, 232 (2d Cir.1991); *United States v. Rollins,* 862 F.2d 1282, 1292 (7th Cir.1988); *United States v. Hoffman,* 832 F.2d 1299, 1310 (1st Cir.1987).

With regard to Detective Speziale's qualifications, the district court concluded that Speziale was "qualified based upon his experience and training ... and he can testify ... with specialized knowledge of how drug trafficking is sometimes conducted and speak to the methods and techniques that may be employed." The court based its ruling, *inter alia,* on evidence that Speziale (1) possessed extensive experience working undercover in large-scale drug trafficking organizations, (2) had served as an instructor to the FBI and the DEA on wiretap techniques, and (3) had listened to more than 350 wiretaps in which narcotics traffickers were communicating using codes and other jargon. Although Plunk's attorney sought to make much on voir dire of the fact that Speziale had no formal training in the use of drug-culture code, we are not persuaded. "[H]ard-core drug trafficking scarcely lends itself to ivied halls. In a rough-and-ready field such as this, experience is likely the best teacher." *Hoffman,* 832 F.2d at 1310.

The district court was well within the bounds of its discretion in qualifying Detective Speziale as an expert and allowing him to testify as such regarding the cryptic codes and jargon of narcotics dealers.

## B

▮ Plunk next contends that Detective Speziale should not have been allowed to

---

**2.** Our interpretation of *Daubert* is consistent with the Supreme Court's own characterization of its decision. *See Daubert,* 509 U.S. at 590 n. 8, 113 S.Ct. 2786 ("Rule 702 also applies to 'technical, or other specialized knowledge.' Our discussion is limited to the scientific context because that is the nature of the expertise offered here.").

provide his expert opinion as to the meanings of code words contained in recordings of wiretapped telephone conversations between Plunk and his associates. Speziale testified, for example, that the intercepted phrases, "How hungry is Panchito? Would he like to have breakfast?" meant "that Pancho could meet in the morning to be loaded with the cocaine." According to Speziale, Plunk's recorded statement that "maybe I can take some documents with me" meant that Plunk hoped to bring home money from a Los Angeles meeting. Plunk argues that such testimony violated Federal Rule of Evidence 704.

Under Rule 704(a), experts are permitted to give their opinions regarding ultimate factual issues. *See* Fed.R.Evid. 704(a). Rule 704(b) creates an exception, providing that "[n]o expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto." Fed.R.Evid. 704(b). We addressed the scope of this exception in *United States v. Morales*, 108 F.3d 1031 (9th Cir.1997) (en banc). Although other circuits have suggested that the rule applies only to psychiatrists and other mental health professionals, the *Morales* court rejected that narrow interpretation, concluding that 704(b) "extends to all expert witnesses." 108 F.3d at 1036. Thus, the rule applies to Detective Speziale. We disagree, however, with Plunk's contention that Speziale's testimony violated Rule 704(b).

Under *Morales*, Rule 704(b) "only precludes expert testimony of an opinion or inference that the defendant did or did not have the requisite *mens rea* and testimony of an opinion or inference which if true would compel the conclusion that the defendant did or did not have the requisite *mens rea.*" *Id.* at 1041. Plunk has pointed to nothing in Speziale's testimony that comprises an explicit opinion that Plunk intended or knew anything in conjunction with the crimes charged. Likewise, nothing in the testimony necessarily compels such an inference or con-

clusion. *See id.* at 1037. Speziale offered his opinion about the meaning of drug jargon in encrypted exchanges between the conspirators, allowing the jurors to determine for themselves the legal significance of the conversations as interpreted. *See, e.g., United States v. Simmons*, 923 F.2d 934, 947 (2d Cir.1991) ("[The agent's] testimony, which related only to the meaning of unfamiliar narcotics jargon, left to the jury the task of determining whether the decoded terms demonstrated the necessary criminal intent.").

Plunk argues that this court in *United States v. Bailey*, 607 F.2d 237, 240 (9th Cir. 1979), approved an expert's testimony interpreting terminology commonly used by narcotics dealers, but disallowed questions "as to specific alleged code words used by [the] defendants." Plunk's reliance on *Bailey* is misplaced. The *Bailey* court did not disallow testimony about specific words used by the defendants in that case; the court simply noted that the trial judge had excluded such testimony. *See id.* In fact, this court commented on the prosecutor's proposal—rejected at trial—to question the expert "as to the meaning of words used in . . . individual conversations," cautioning that "[w]e express no view as to whether the prosecution's proposed procedure would have been proper." *Id.* at 240 n. 8.

*Bailey* does not stand for the proposition that experts testifying about drug jargon may not explain the meanings of specific code words. Under Rule 704(b), the issue is not whether Detective Speziale's testimony included his expert opinion about code words used specifically by Plunk and his associates; rather, the issue is whether the testimony constituted "an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged." Fed.R.Evid. 704(b). We hold that it did not.

## C

 Finally, with regard to Detective Speziale's expert testimony, Plunk contends on appeal that the district court should have excluded the evidence under Federal Rule of Evidence 403 [3] because its probative value

**3.** Rule 403 provides: "Although relevant, evidence may be excluded if its probative value is

was substantially outweighed by its prejudicial effect. A review of the record, however, reveals that, despite his many other objections,[4] Plunk did not object to any of Speziale's testimony on Rule 403 grounds in the district court. He never complained to the trial judge that the evidence regarding the wiretap conversations was cumulative, confusing, or unduly prejudicial. Because Plunk failed to make a Rule 403 objection in the trial court, we review the admission of the testimony under that Rule only for plain error. *See* Fed.R.Crim.P. 52(b);[5] Fed. R.Evid. 103(d);[6] *United States v. Gomez–Norena*, 908 F.2d 497, 499–500 (9th Cir.1990).

According to the Supreme Court's most recent articulation of the plain error standard, before an appellate court may address and correct an error not raised at trial, several conditions must be satisfied:

> [T]here must be (1) "error," (2) that is "plain," and (3) that "affect[s] substantial rights." If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings."

*Johnson v. United States*, 520 U.S. 461, ——, 117 S.Ct. 1544, 1549, 137 L.Ed.2d 718 (1997) (quoting *United States v. Olano*, 507 U.S. 725, 732, 113 S.Ct. 1770, 1776, 123 L.Ed.2d 508 (1993)) (citations and internal quotation marks omitted).

■ The decoded words and phrases provided by Speziale's testimony carried tremendous probative value; without them, the jury would have been completely incapable of comprehending the conspirators' exchanges.

The evidence was not merely cumulative of testimony that had come before it. Nor, in light of the district court's repeated cautionary instructions to the jury that it could assign Speziale's testimony whatever value it wished, was there any significant danger of unfair prejudice to Plunk. Consequently, it was not plain error for the district court to admit Speziale's interpretations of the conspirators' encoded conversations.[7]

### D

In sum, each of Plunk's challenges to the admission of Detective Speziale's code-interpretation testimony fails. The district court did not abuse its discretion in permitting the evidence.

### III

■ In December 1993, the DEA regional office in Anchorage issued an administrative subpoena to McCaw Communications requesting Plunk's telephone records. The subpoena was issued pursuant to 21 U.S.C. § 876(a), which provides, in relevant part:

> In any investigation relating to his functions under this subchapter with respect to controlled substances ... the Attorney General may subpena (sic) witnesses, compel the attendance and testimony of witnesses, and require the production of any records (including books, papers, documents, and other tangible things which constitute or contain evidence) which the Attorney General finds relevant or material to the investigation. The attendance of witnesses and the production of records may be required from any place in any

---

substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403.

4. During the course of Speziale's direct examination, Plunk's counsel objected, *inter alia*, on the following grounds: hearsay, confrontation, improper opinion as to mental state, relevance, vagueness, speculation, foundation, leading questions, and nonresponsiveness.

5. Rule 52(b) provides: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

6. Rule 103(d) provides: "Nothing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the court."

7. Indeed, in view of the inherently fact-specific nature of the Rule 403 balancing inquiry, and the special deference to which district courts' decisions to admit evidence pursuant to that Rule are entitled, *see, e.g., Borunda v. Richmond*, 885 F.2d 1384, 1388 (9th Cir.1988); *United States v. Layton*, 767 F.2d 549, 554 (9th Cir.1985). it is the rare exception when a district court's decision to admit evidence under Rule 403 constitutes plain error.

State or in any territory or other place subject to the jurisdiction of the United States at any designated place of hearing.

21 U.S.C. § 876(a).

■ On appeal, Plunk argues that the "plain meaning" of § 876(a) precludes the production of documents except in conjunction with an agency hearing. We need not pronounce judgment upon Plunk's novel interpretation of § 876(a), however, because Plunk lacks standing to challenge the issuance of the subpoena. The subpoena was "not directed at [Plunk], but rather at third party businesses"; consequently, Plunk does not have the requisite standing to challenge its issuance under the Fourth Amendment "unless he [can] demonstrate that he had a legitimate expectation of privacy attaching to the records obtained." *United States v. Phibbs*, 999 F.2d 1053, 1077 (6th Cir.1993). Under longstanding Ninth Circuit precedent, individuals possess no reasonable expectation of privacy in telephone records. *See, e.g., United States v. Lustig*, 555 F.2d 737, 747 n. 10 (9th Cir.1977). Plunk is thus without Fourth Amendment standing to challenge the subpoena. Nor does Plunk possess statutory standing to attack the subpoena, because he has not demonstrated that he was within the "zone of interests" intended to be protected by § 876(a). *See United States v. Moffett*, 84 F.3d 1291, 1293 (10th Cir.1996). Section 876 was "written to give the DEA broad powers to investigate violations of federal drug laws" and "provides no express right to challenge the Attorney General's subpoenas issued under it." *Id.*

## IV

Plunk also challenges the identification testimony of two government witnesses. Carlos Serrato, one of Plunk's co-conspirators, identified Plunk's voice on recordings of several phone conversations played at trial and made a visual identification of Plunk in reliance on what Plunk terms a "highly suggestive" photographic lineup. Detective Speziale also identified a voice on tape recordings admitted into evidence as being Plunk's. We consider their identifications in turn.

### A

#### 1

■ Plunk first argues, as a threshold matter, that Serrato's out-of-court photo and voice identifications, which were conducted well after his indictment, were "critical stages" of the criminal prosecution, and were conducted outside the presence of counsel in violation of *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). Plunk, however, ignores controlling post-*Wade* precedent. In *United States v. Ash*, 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973), the Supreme Court carefully circumscribed its decision in *Wade*: "[T]he Sixth Amendment does not grant the right to counsel at photographic displays conducted by the Government for the purpose of allowing a witness to attempt an identification of the offender." *See id.* at 321, 93 S.Ct. 2568; *accord United States v. Barker*, 988 F.2d 77, 78 (9th Cir.1993). Similarly, following *Ash*, this court held that pretrial voice identifications "are not, for Sixth Amendment purposes, critical stages of the criminal proceeding." *United States v. Kim*, 577 F.2d 473, 481 (9th Cir.1978). Plunk's Sixth Amendment "right to counsel" argument is thus without merit.

#### 2

■ Plunk also contends that Serrato's photographic and voice identifications were conducted in an impermissibly suggestive manner, thus contravening the Due Process Clause of the Fifth Amendment. Specifically, with regard to the voice identification, Plunk complains that the taped exemplar from which Serrato first identified Plunk's voice was prefaced by a female voice saying, "You're looking for Frank?" Serrato, however, denied being influenced by the woman's remark; rather, he testified that he was able accurately to identify Plunk's voice because he had "spoken to him on numerous occasions" and because he recognized both the tone and the pattern of Plunk's speech.

With respect to the photographic identification, Plunk contends on appeal that his "photograph was presented with his name on it, amidst 5 other photographs, one of which

was Mr. Serrato himself, and the others were either Colombians known to him or otherwise labeled." Plunk's characterization of the photographic lineup, however, is not entirely accurate. It is true that Serrato was shown approximately six photographs and that three of the photographs depicted men with whom he was familiar; Serrato, however, did not recognize the individuals depicted in two photographs. He identified Plunk in the sixth photograph. Plunk's reference to the fact that his picture was presented to Serrato "with his name on it" is similarly misleading. Although Plunk's name was on the photograph, it was on the *back side* of the print—a side not shown to Serrato during the identification.

 Our task in evaluating the constitutionality of the identification techniques is simplified by the fact that photographic and voice identifications are governed by "essentially the same" constitutional standards. *United States v. Pheaster*, 544 F.2d 353, 369–70 (9th Cir.1976). Even if we assume, for the purposes of decision, that the identification procedures were unnecessarily suggestive, that assumption does not end the inquiry. There simply is no per se rule of exclusion for unnecessarily suggestive identification techniques. *See Manson v. Brathwaite*, 432 U.S. 98, 109–14, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *see also United States v. Kessler*, 692 F.2d 584, 586 (9th Cir.1982) ("[A]t least some level of suggestibility is legitimate."). If an identification procedure is impermissibly suggestive, the reviewing court must decide "if the identification testimony ... is nonetheless sufficiently reliable to be admitted into evidence." *United*

States v. Nash, 946 F.2d 679, 681 (9th Cir. 1991); *see also Brathwaite*, 432 U.S. at 114, 97 S.Ct. 2243 ("[R]eliability is the linchpin in determining the admissibility of identification testimony."). In gauging reliability, we must consult the totality of the circumstances, paying particular attention to the five factors articulated in *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972):

(1) the opportunity of the witness to observe the criminal at the time of the crime;

(2) the witness's degree of attention;

(3) the accuracy of the witness's prior description of the criminal;

(4) the level of certainty demonstrated by the witness at the confrontation; and

(5) the length of time between the crime and the confrontation.

*See id.* at 199–200, 93 S.Ct. 375.[8] An out-of-court identification is admissible, along with the resulting in-court testimony, "if factors indicating reliability outweigh the effect of the suggestive presentation" of the photographs or voice exemplars. *United States v. Wang*, 49 F.3d 502, 505 (9th Cir.1995).

In this case, the district court examined and applied the *Biggers* factors methodically and thoroughly (with the exception of the third, which it found "hard to apply" because there was no "prior description" in the record). First, it found that through their common criminal dealings, "Mr. Serrato had a substantial opportunity to view ... Frank Plunk." Second, it concluded that Serrato was "both smart and observant," and that, particularly in light of the illegal nature of his activity, he would have "paid close atten-

---

**8.** Citing *United States v. Field*, 625 F.2d 862, 866 (9th Cir.1980), Plunk contends that reviewing courts must also take into consideration two other factors, in addition to those catalogued by the Supreme Court in *Biggers:* (1) the presence and influence of other witnesses at the time of the prior identification and (2) any conduct on the part of the government agents tending to focus the witness's attention on the defendant. It would appear, however, that the additional factors Plunk references—which were originally articulated in *Parker v. Swenson*, 332 F.Supp. 1225, 1230–31 (E.D.Mo.1971), and adopted by the Ninth Circuit in *United States v. Crawford*, 576 F.2d 794 (9th Cir.1978)—are victims of constitutional desuetude. The most recent Ninth Circuit decision to reference those factors was issued in

1983, *see United States v. Burnette*, 698 F.2d 1038 (9th Cir.1983), and even that case spoke of them in the past tense. *See id.* at 1045 n. 11 ("We formerly employed a somewhat different standard.") On the contrary, the Ninth Circuit cases evaluating out-of-court identifications exclusively under *Biggers* are legion. *See, e.g., United States v. Jones*, 84 F.3d 1206, 1209–10 (9th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 405, 136 L.Ed.2d 319 (1996); *United States v. Matta–Ballesteros*, 71 F.3d 754, 769 (9th Cir.1995), *modified,* 98 F.3d 1100 (9th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 965, 136 L.Ed.2d 850 (1997); *United States v. Dring*, 930 F.2d 687, 692–93 (9th Cir.1991). Consequently, we reject Plunk's claim that the *Biggers* factors do not control our decision.

tion to the people [including Plunk] he was dealing with." With regard to the fourth factor, the district court determined that "based on Mr. Serrato's testimony ... I think he was very certain that ... the man in the photograph was Mr. Plunk." Finally, the court concluded that the length of time that had elapsed since the crime, although not insignificant, was less than the seven months that the Supreme Court approved in *Biggers*.[9] The district court therefore concluded that the photographic identification was reliable, and thus admissible. The district court also held that "for essentially the same reasons, I'm going to allow [Serrato] to identify the voices on the tape."

Although the manner in which the government elicited Serrato's identifications was perhaps not perfect, there is little reason to doubt the reliability of those identifications. In addition to the reasons set forth in the district court's ruling, Serrato testified that, during the course of the conspiracy, he had spoken to Plunk on twenty separate occasions—"not only on the phone, but also speaking directly to him"—and had met with him in person several times. Moreover, during neither the photographic nor the voice identification was Serrato "told or led to believe that any person in any of the pictures [or on any of the tapes] ... was [Plunk]," even after he had made the identification. *United States v. Matta–Ballesteros*, 71 F.3d 754, 769 (9th Cir.1995), *modified*, 98 F.3d 1100 (9th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 965, 136 L.Ed.2d 850 (1997). Finally, there is no evidence in the record that Serrato "felt pressure to make a positive identification." *United States v. Dring*, 930 F.2d 687, 693 (9th Cir.1991).

For these reasons, as well as those ably articulated by the district court, we hold that Serrato's photographic and voice identifications were not elicited unconstitutionally.

**B**

▆▆▆▆ Plunk also challenges Detective Speziale's in-court identification of his voice on tape-recorded telephone conversations that were introduced into evidence. Speziale's identification should not have been ad-

mitted, Plunk contends, because "[n]o demonstration of [Speziale's] familiarity with Mr. Plunk's voice or voice on tape was offered." Had Plunk objected to Speziale's identification at trial and the district court ruled on his objection, we would review the evidentiary ruling for abuse of discretion. *See United States v. Duran*, 4 F.3d 800, 802–03 (9th Cir.1993). Plunk, however, did not object to the admission of Speziale's identification testimony at trial; in fact, Plunk's counsel stated that, although he preferred that Speziale not point at Plunk from the witness stand, he "ha[d] no problem with [Speziale] identifying Mr. Plunk." Consequently, we review only for plain error. As discussed earlier, under the plain error standard, before relief may be granted, Plunk must demonstrate (1) that there was "error," (2) that the error was "plain," (3) that the error "affect[s] substantial rights," and (4) that the error "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Johnson*, at ——, 117 S.Ct. at 1549. Plunk's objection to Speziale's voice identification cannot survive even the first prong of the *Johnson* standard, because the district court's admission of the identification was not erroneous.

The nature of Plunk's challenge to Speziale's in-court identification testimony is somewhat different from his objections to Serrato's out-of-court identifications. With respect to Speziale's testimony, it was the tape recording itself—and not Speziale's identification of the voice on the tape—that was offered as evidence. Consequently, whereas Plunk attacked Serrato's photographic and voice identifications (which were themselves offered as evidence) under the Due Process Clause as being unduly suggestive, his challenge to Speziale's testimony is premised upon Federal Rule of Evidence 901, which governs the authentication and identification of evidentiary records.

▆▆▆ Rule 901(a) provides generally that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question

---

9. It is also worthy of note with regard to the fifth *Biggers* factor that this court, in *Matta–Ballesteros*, 71 F.3d 754, approved a six-year gap between initial observation and in-court identification. *See id.* at 770.

is what its proponent claims." Fed.R.Evid. 901(a). Rule 901(b)(5) states a more specific rule applicable to voice identifications. It is sufficient that there be an "[i]dentification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker." Fed. R.Evid. 901(b)(5). Rule 901(b)(5) establishes a low threshold for voice identifications offered to determine the admissibility of recorded conversations. So long as the identifying witness is "minimally familiar" with the voice he identifies, Rule 901(b) is satisfied. *See United States v. Cerone*, 830 F.2d 938, 949 (8th Cir.1987); *United States v. Cuesta*, 597 F.2d 903, 915 (5th Cir.1979). The record reveals that Speziale was present in Anchorage at Plunk's initial post-arrest interview. The familiarity that he gained through that exposure was sufficient under Rule 901(b)(5) to support his identification of Plunk's voice on the tape recorded conversations being offered into evidence.

## V

Plunk next maintains that the jury that convicted him was contaminated by two separate incidents of alleged misconduct: (1) a security officer's brief comment to one of the jurors, and (2) the provision of a dictionary to members of the jury during deliberations. We examine each in turn.

### A

 On the morning of the third day of jury deliberations, Judge Sedwick received a note from a court security officer, Dana Nichols, indicating that Nichols had overheard a conversation between one of the jurors, Richard Mitchell, and the jury clerk. According to Officer Nichols, Mitchell had expressed a "concern" that the jury room was not secure. In response, Officer Nichols had attempted to reassure Mitchell: "[T]he jury room and evidence is all secure and that is our discretion over securing the items for the Court." After discussing the incident with counsel, the trial judge drafted a short

note to the jury, in which both attorneys assented:

> To the jury: It has come to the attention of the Court that one or more jurors may be concerned that because I ordered the Clerk to retain the tape recordings which are exhibits after the replay of some tapes, that this somehow may create a problem. It does not. The tapes remain secure and available. You should not concern yourselves further about this issue.

Tr. 15:5.

 On appeal, Plunk contends that Officer Nichols's brief comment to juror Mitchell that "[t]he jury room and evidence is all secure" constitutes reversible error. Pursuant to Ninth Circuit precedent, however, "[t]o obtain a new trial, the defendant must establish that actual prejudice resulted from an ex parte contact with a juror." *United States v. English*, 92 F.3d 909, 913 (9th Cir. 1996). Plunk has alleged no specific prejudice resulting from Nichols's communication with Mitchell. Nor can we imagine how any would have arisen, given the decidedly non-substantive nature of Nichols's remark.[10] In assessing potential prejudice, this court has previously distinguished substantive contact from "the kind of technical assistance rendered by [security officers] in dealing with the physical needs of the jury." *United States v. Kupau*, 781 F.2d 740, 743 (9th Cir.1986); *see also Lee v. Marshall*, 42 F.3d 1296, 1298–99 (9th Cir.1994) (finding "no hint of prejudice" in a brief discussion between jury members and police officers regarding the repair of a VCR, despite the fact that it was "most likely" the district attorney who had instructed the officers to enter the jury room). Officer Nichols's comment was innocuous. There is no reasonable probability that it affected the jury's deliberative process; consequently, reversal is not required.

### B

 Shortly after Judge Sedwick had resolved the issue regarding officer Nichols, the jury sent a note requesting a dictionary. Judge Sedwick, who was on the bench in

---

**10.** This case is worlds away, for instance, from *Parker v. Gladden*, 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966), in which a bailiff in charge of a sequestered jury stated to a juror, in front of the entire panel, "Oh that wicked fellow, he is guilty," *id.* at 363, 87 S.Ct. 468.

another matter, had instructed the court clerk that "if the jury requests things like pens or pencils or paper to write on, she could just give them ... to the jury." When the clerk received the dictionary request, she called Judge Sedwick's secretary, who authorized delivery of the dictionary to the jury room. The secretary then contacted Judge Sedwick, who corrected her, saying "No, that's not appropriate. Stop the delivery of the dictionary." The bailiff immediately retrieved the dictionary from the jury room.

▇▇▇ Judge Sedwick interviewed the jurors regarding the incident. According to two jurors' reports, the jury had possession of the book for no more than one or two minutes. Juror Mitchell, who had requested the dictionary, informed the judge that he had opened the book, and that he had intended to look up the word "organizer,"[11] but that he had been unable to read the definition before the bailiff demanded the return of the dictionary. No other jurors viewed the dictionary. After speaking with the jury, Judge Sedwick specifically instructed the jury that it could not consult the dictionary. He then concluded:

> There's nothing I can do about what has happened. I have satisfied myself that no harm was done, that the deliberations have not been imperiled by the importation into them of something extraneous to the evidence.

Tr. 15:34. Judge Sedwick's own characterization of the incident's impact on the trial is significant, because, although we review alleged incidents of juror misconduct independently, we must accord special deference to the trial judge's impression of the impact of the evidence:

> The trial judge is uniquely qualified to appraise the probable effect of information on the jury, the materiality of the extraneous material, and its prejudicial nature. He or she observes the jurors throughout the trial, is aware of the defenses asserted, and has heard the evidence. The judge's conclusion about the effect of alleged juror misconduct deserves substantial weight.

*United States v. Bagnariol,* 665 F.2d 877, 885 (9th Cir.1981).

Plunk now contends that the jury's exposure to the dictionary constitutes reversible error. Because the jury was instructed on the CCE count that it must find as an element of the crime that "the defendant acted as an *organizer,* supervisor or manager of the five or more persons," Plunk complains that "providing the dictionary ... violated [his] right to equal protection and due process[,] to effective assistance of counsel, to a jury trial, and to protections of a judge in so far as numerous uncensored and inappropriate instructions were undoubtedly read by the jurors."

▇▇▇ It cannot be doubted that "[j]urors have a duty to consider only the evidence which is presented to them in open court." *Bayramoglu v. Estelle,* 806 F.2d 880, 887 (9th Cir.1986). However, there is no rule of automatic reversal for a juror's reception of extraneous information, irrespective of the nature of the information or the manner in which it is received. *See United States v. Steele,* 785 F.2d 743, 745–46 (9th Cir.1986). Indeed, "not every incident of juror misconduct or bias [even] requires a new trial." *United States v. Hendrix,* 549 F.2d 1225, 1229 (9th Cir.1977). Rather, whenever a jury "obtains or uses" evidence extrinsic to the trial record, a new trial is warranted only "if there existed a reasonable possibility that the extrinsic material could have affected the verdict." *Marino v. Vasquez,* 812 F.2d 499, 504 (9th Cir.1987) (quoting *United States v. Vasquez,* 597 F.2d 192, 193 (9th Cir.1979)) (internal quotation marks omitted).

▇▇▇ In several cases, we have suggested that courts reviewing juror-misconduct appeals involving extrinsic evidence should consider five separate factors to determine the probability of prejudice: "(1) whether the extrinsic material was actually received, and if so, how; (2) the length of time it was available to the jury; (3) the extent to which the jury discussed and considered it; (4) whether the extrinsic material was introduced before a verdict was reached, and if so,

---

11. In order to convict Plunk on the CCE count, the prosecution had to demonstrate, among other things, that Plunk "occupie[d] a position of *orga-* *nizer,* a supervisory position, or any other position of management ...." 21 U.S.C. § 848(c)(2)(A) (emphasis added).

at what point in the deliberations it was introduced; and (5) any other matters which may bear on the issue of the reasonable possibility of whether the introduction of extrinsic material affected the verdict." *E.g.,* *United States v. Navarro–Garcia,* 926 F.2d 818, 822–23 (9th Cir.1991) (internal quotation marks omitted). This case, however, is different. Because none of the jurors in the instant case ever actually viewed the definition of the word "organizer," the extrinsic evidence (which was the definition itself, and not the dictionary) was never actually "considered," *see Bayramoglu,* 806 F.2d at 887, or "obtain[ed] or use[d]," *see Marino,* 812 F.2d at 504, by the jury.[12] Consequently, by definition, there could be no "reasonable possibility" that the evidence affected the jury's deliberations.

Even if we were to apply the five-part standard, reversal would still be unwarranted. Although the fourth factor might weigh marginally in favor of a finding that the evidence could have impacted deliberations because the dictionary was introduced prior to the verdict being reached, the first, second, and third factors all counsel the opposite conclusion. First, and most importantly, as alluded to above, the definition was never read, and hence was never "received" by the jury. Second, this is not a case like *Steele,* 785 F.2d 743, in which the jury had possession of the dictionary for at least two hours, *see id.* at 745; here, by contrast, even the most liberal estimates place the dictionary in the jury room for only two minutes. Third, and again unlike *Steele,* the definition of "organizer" was not read aloud, and there was no general discussion of the term's meaning.[13] A final consideration weighing against a finding of reversible error—a consideration that fits within *Navarro–Garcia's* fifth, catch-all factor—is the "substantial weight" that we must give to the district court's own conclusion that "no harm was done, [and] that the deliberations [were not] imperiled."

**C**

In sum, we hold that there is no "reasonable possibility" that either Officer Nichols's reassuring comment to juror Mitchell or the brief presence in the jury room of a dictionary materially affected the verdict. Consequently, the incidents do not warrant reversal of Plunk's convictions.

**VI**

■ Early in the trial, the district court admitted into evidence a number of tapes of wiretapped conversations between Plunk and his co-conspirators. When the government first sought to play one of the tapes for the jury and to distribute a transcript to accompany the recording, Judge Sedwick carefully instructed the jury as to the appropriate use of the transcripts:

Ladies and gentlemen, tape recordings of conversations have been received in evidence. . . . A typewritten transcript of the tape recorded conversation is furnished to you for your convenience in assisting you in following the conversation or in identifying the speakers.

. . . It is the tape and not the transcript that is the evidence. Where the conversations are in a language other than English, you'll have to rely on the transcripts and make your decision based upon those. But I emphasize that where the conversation is in English, it is the conversation on the tape that is the evidence, not the transcript.

Tr. 2:57–58. Judge Sedwick repeated his cautionary instruction to the jury each time one of the tapes was played.

During deliberations, the jury sent a note to Judge Sedwick requesting to have several tapes replayed. After some discussion with counsel, and over an objection by Plunk's attorney, Judge Sedwick decided that the jury would be permitted to hear the tapes once again, and would have the benefit—as it did during the trial—of using the transcripts as guides. Judge Sedwick reassured Plunk's attorney, however, that "the jury [was] going

---

**12.** At the risk of belaboring the obvious, we pause to emphasize that when a defendant challenges a juror's reception of extrinsic information, he must, as a threshold matter, make a showing that the juror actually received—*i.e.,* either saw or heard—the information.

**13.** It is certainly worth noting that the *Steele* court, which had before it a much closer case than this, concluded that there was "no reasonable possibility that the jury's unauthorized use of the dictionary affected the verdict." *See* *Steele,* 785 F.2d at 749.

to be told in no uncertain terms ... that transcripts are not evidence." Judge Sedwick summoned the jurors from the jury room into the courtroom to listen to the tapes. Before playing the requested tapes for the jurors, Judge Sedwick carefully instructed them as he had before:

... The transcripts are available to you if you choose to use them. Let me emphasize that it is what is on the tapes that is evidence. The transcripts are not evidence. They're provided for your assistance. But what you hear on the tapes is the evidence. The transcripts are most assuredly not evidence.

Tr. 14:25–26.

■■■ On appeal, Plunk contends—without citation to authority—that Judge Sedwick's decision to allow the jury access to the transcripts during deliberations "violated [Plunk's] right to due process, confrontation, counsel, and to a jury trial." We review the district court's decision to allow the jury to view written transcripts during deliberations only for abuse of discretion. *See United States v. Taghipour*, 964 F.2d 908, 910 (9th Cir.1992).

■■■ It is well established in this circuit that the admission of typewritten transcripts "as an aid in listening to tape recordings ... is a matter committed to the sound discretion of the trial court." *United States v. Turner*, 528 F.2d 143, 167–68 (9th Cir.1975). A number of considerations convince us that there was no abuse of discretion here. First, when the transcripts were initially distributed, Judge Sedwick admonished the jury to keep them face down until the tape began to play: "Ladies and gentlemen, don't start looking through those books just yet. Just pass them out, please." Second, the transcripts themselves were never received into evidence. Third, Judge Sedwick clearly and repeatedly instructed the jury that it was to consider the tapes, and not the transcripts, as substantive evidence. Finally, the parties expressly stipulated that "[i]f called to testify, each [transcript] monitor would identify the conversation they monitored and would testify that the recordings being offered in

court are authentic and accurate and complete reproductions of the conversations overheard, monitored and recorded by said monitor." *See United States v. Booker*, 952 F.2d 247, 250 (9th Cir.1991).

■■■ It is also significant that Plunk's attorneys have not pointed to any "substantial[ ] inaccura[cies]" in the transcripts. *United States v. Pena–Espinoza*, 47 F.3d 356, 360 (9th Cir.1995). In fact, the parties expressly stipulated to the fact that "these conversations were reviewed by certified language specialists or Special Agents, employed by the Drug Enforcement Administration, who then prepared to the best of their abilities, complete written or typed verbatim transcripts of these conversations in the English language." Plunk, of course, maintains that he did raise an issue as to the accuracy of the transcripts by arguing that "the use of [his] name over 140 times on the transcript as a speaker was inaccurate and prejudicial." Standing alone, however, a defendant's claim that he has been erroneously identified as a speaker in a transcript of a recorded conversation does not constitute an allegation of "inaccuracy" sufficient to trigger close scrutiny of a district judge's decision to permit the jury to view the transcript; rather, his challenge must run to the substantive accuracy of the conversation itself. *See United States v. Ulerio*, 859 F.2d 1144, 1145–46 (2d Cir.1988) (cited with approval in *Taghipour*, 964 F.2d 908). "[W]here no issue as to accuracy is raised, it is not an abuse of discretion for a trial judge to allow the transcripts into the jury room." *Taghipour*, 964 F.2d at 910. As a result, Plunk's transcripts-based challenge must fail.

## VII

■■ Shortly before noon on the third day of deliberations, the jury sent a note to Judge Sedwick. The note read: "We, the jury, have reached verdicts on seven counts. We are at an impasse on the remaining three counts. How do you wish us to proceed?" After consulting counsel, Judge Sedwick decided to administer a modified *Allen* charge, *see Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).[14] Later that

---

14. The charge stated, in relevant part:

As jurors, you have a duty to discuss the case with one another and to deliberate in an effort

to reach a unanimous verdict, if each of you can do so without violating your individual judgment and conscience. Each of you must

afternoon, the jury sent another note indicating that it was still unable to reach a unanimous verdict as to three counts. Judge Sedwick then called the jury into the courtroom to receive its decision.

 Plunk contends that the district court's *Allen* charge—when considered in conjunction with its discussion with the jury members regarding their near-unauthorized use of the dictionary—was unnecessarily coercive. We review a district court's decision to issue an *Allen* instruction for abuse of discretion. *See United States v. Wills*, 88 F.3d 704, 717 (9th Cir.1996). The district court's deliverance of an *Allen* instruction "must be upheld unless it is clear from the record that the charge had an impermissibly coercive effect on the jury." *United States v. Lorenzo*, 43 F.3d 1303, 1307 (9th Cir.1995).

 There is no per se rule in this circuit preventing the use of *Allen* instructions. *See United States v. Nickell*, 883 F.2d 824, 828 (9th Cir.1989). Indeed, we recently acknowledged that "[a]n Allen charge is, on occasion, a legitimate and highly useful reminder to a jury to do its duty." *Rodriguez v. Marshall*, 125 F.3d 739, 750 (9th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 2304, 141 L.Ed.2d 163 (1998). In assessing the coerciveness of an *Allen* charge, we must inquire into (1) the form of the instruction, (2) the total time of deliberation and the time of deliberation following the instruction, and (3) any other indicia of coerciveness. *See United States v. Cuozzo*, 962 F.2d 945, 951 (9th Cir.1992).

With respect to the form of the instruction, the court in *Jiminez v. Myers*, 40 F.3d 976 (9th Cir.1993), emphasized in finding reversible error that the trial judge had failed to "instruct[ ] the hold-out juror not to surrender his or her sincere convictions." *Id.* at 981. There was no similar failure in this case. Quite the contrary, Judge Sedwick specifically directed the jurors "not [to]

change an honest belief as to the weight or effect of the evidence solely because of the opinions of your fellow jurors or for the mere purpose of returning a verdict." The total duration of deliberations and the time that elapsed between the *Allen* charge and the verdict also suggest the absence of coercion. The jury had been deliberating for approximately two days when it initially apprised the judge that it was deadlocked as to three counts. After the *Allen* charge was administered, it took the jury roughly two hours to conclude its deliberations. We have, in the past, specifically approved of similar time frames. *See, e.g., United States v. Bonam*, 772 F.2d 1449, 1451 (9th Cir.1985).

None of the "other indicia" of coercion traditionally invoked by courts evaluating *Allen* charges is present in the instant case, either. Judge Sedwick did not, for instance, know whether the seven decided counts were convictions, acquittals, or (as it turned out) a mixed bag. *See Rodriguez*, 125 F.3d at 751. Nor did he know the identity of the holdout jurors. *See United States v. Sae–Chua*, 725 F.2d 530, 532 (9th Cir.1984). Moreover, the fact that the jury rendered a mixed verdict—convicting on some counts, acquitting on one, and hanging on others—suggests that it reviewed the evidence "rational[ly] and independent[ly]." *Cuozzo*, 962 F.2d at 952. Finally, the fact that the ratio of counts upon which the jury had reached unanimous verdicts to those upon which it had not was seven to three both before and after the charge negates any inference of coercion. Plunk contends that "[a]lthough the jury had reached a decision as to seven counts and was hung as to three both before and after the *Allen* instruction, there is no way of knowing whether its decision was the same as to the same counts." His speculation, however, is merely that: speculation. It is not "clear from the record" that the *Allen*

decide the case for yourself, but only after you consider the evidence impartially with your fellow jurors.
 During your deliberations, you should not hesitate to reexamine your own views and change your opinion if you become persuaded that it is wrong. However, you should not change an honest belief as to the weight or effect of the evidence solely because of the

opinions of your fellow jurors or for the mere purpose of returning a verdict. All of you are equally honest and conscientious jurors who have heard the same evidence. All of you share an equal desire to arrive at a verdict. Each of you should ask yourself whether you should question the correctness of your present position.
Tr. 15:49–50.

charge had a coercive effect on the jury. *Lorenzo,* 43 F.3d at 1307.

## VIII

█ At sentencing, one of Plunk's co-conspirators, Timothy Pierson, offered testimony indicating that Plunk had perjured himself at Pierson's own sentencing hearing. Pierson acknowledged under oath that he had personally asked Plunk to testify that Pierson "didn't know that there was cocaine on the trucks, that [he] was tricked, that [he] didn't join the conspiracy or know about it till late November, early December [1993]." He further testified that Plunk had sworn an affidavit to that effect and had testified in person at Pierson's sentencing hearing that the affidavit was correct. Pierson frankly admitted, however, that Plunk's affidavit was false, and that Pierson had in fact known of the conspiracy prior to the December 1993 meeting. Based in large part on Pierson's testimony, the district court found that Plunk had obstructed justice within the meaning of § 3C1.1 of the United States Sentencing Guidelines,[15] and therefore adjusted Plunk's sentencing level upward two levels, from 41 to 43.[16]

Plunk contends on appeal that Pierson "could have been substantially impeached" by materials in the possession of Pierson's federal public defender, Kevin McCoy. According to Plunk's brief, McCoy's files contained notes, allegedly in Pierson's own hand, that contradicted some of the statements that Pierson made at Plunk's sentencing hearing. Plunk maintains that the prosecution's failures to discover and to disclose the notes constituted a violation of its obligations under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

█ Pursuant to *Brady,* "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to

guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. 1194. As Plunk correctly asserts, a prosecutor's *Brady* obligation extends to impeachment evidence. *See Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). However, "[w]hile the prosecution must disclose any [*Brady* ] information within the possession or control of law enforcement personnel, it has no duty to volunteer information that it does not possess." *United States v. Monroe,* 943 F.2d 1007, 1011 n. 2 (9th Cir.1991) (internal quotation marks omitted). As a general matter, information "beyond that contained in the government's files" is not subject to the strictures of *Brady. See United States v. Hsieh Hui Mei Chen,* 754 F.2d 817, 824 (9th Cir.1985). In this case, the notes that Plunk sought were in the files of the federal public defender; consequently, the prosecution did not "possess" or "control" the requested information. *Cf. United States v. Aichele,* 941 F.2d 761, 764 (9th Cir.1991) (holding that a federal prosecutor had no *Brady* obligation with regard to information in the files of state authorities); *United States v. Friedman,* 593 F.2d 109, 120 (9th Cir.1979) (holding that a prosecutor had no *Brady* obligation with regard to the diary of a defendant's co-conspirator). The government was therefore under no obligation to search for or to provide the notes.[17]

## IX

█ In October 1994, Plunk filed a motion in the district court seeking an order barring further prosecution. He argued that because certain items of his property had been subject to administrative forfeiture pursuant to 19 U.S.C. § 1609, any criminal prosecution should be precluded by the Double Jeopardy Clause of the Fifth Amendment.[18] Specifically, he pointed to the administrative

---

**15.** Section 3C1.1 provides: "If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels." U.S.S.G. § 3C1.1.

**16.** In a separate unpublished disposition filed contemporaneous herewith, we affirm the district court's upward adjustment.

**17.** A contrary rule would have the untoward consequence of eviscerating the attorney-client privilege between public defenders and their clients.

**18.** The Double Jeopardy Clause provides: "[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V.

seizure and forfeiture of (1) a Rolex watch, (2) assorted firearms, (3) $9,660 in U.S. currency, and (4) $967.89 worth of gold. Judge Sedwick granted Plunk's motion and dismissed five counts of the indictment on double jeopardy grounds.

On interlocutory appeal, however, this court reversed Judge Sedwick's decision to dismiss the several counts. *See United States v. Plunk,* Nos. 94–30421, 94–30422, 1995 WL 619299, 68 F.3d 482 (9th Cir. Oct. 17, 1995), *cert. denied,* 517 U.S. 1188, 116 S.Ct. 1673, 134 L.Ed.2d 777 (1996) (*"Plunk I"*).[19] The court observed that Plunk had received notice of the government's intention to seek forfeiture of his property but had failed to file a claim of ownership; consequently, pursuant to § 1609, the government had declared the property forfeited without a formal adjudication. Relying on *United States v. Cretacci,* 62 F.3d 307 (9th Cir.1995), the *Plunk I* court held that "[t]he administrative forfeiture of unclaimed property ... does not impose a 'punishment' for purposes of the Double Jeopardy Clause." *Plunk I,* 1995 WL 619299, at *1. Because Plunk had not asserted any claim to the seized property, the court determined, he had not been "punished" when it was forfeited. In reaching its conclusion, the court addressed and dismissed Plunk's contention that "he was forced not to formally contest the civil forfeitures (and thus suffer punishment) to protect his Fifth Amendment privilege in the pending criminal case." Invoking *Cretacci,* the court "rejected 'the argument that by requiring a defendant to claim his property we force him to sacrifice his right against self-incrimination in order to preserve his right against Double Jeopardy.'" *Id.* (quoting *Cretacci,* 62 F.3d at 311). The court concluded:

> In light of the rationale set forth in *Cretacci,* we hold that the forfeiture of Plunk's abandoned property was not a "punishment," and thus Plunk was not placed in jeopardy. Accordingly, the subsequent criminal prosecution is not barred by the Double Jeopardy Clause. *Id.* at *2.

▓▓▓▓ In this appeal, Plunk maintains that notwithstanding *Plunk I,* "the instant convictions and sentences and further, the other counts of indictment are. jeopardy barred and this court must reverse and remand with an order precluding further prosecution for same." The doctrine of "law of the case," however, precludes a reevaluation of Plunk's contention. Under that doctrine, "the decision of an appellate court on a legal issue must be followed in all subsequent proceedings in the same case." *Jeffries v. Wood,* 114 F.3d 1484, 1489 (9th Cir.) (en banc) (quoting *In re Rainbow Magazine, Inc.,* 77 F.3d 278, 281 (9th Cir.1996)), *cert. denied,* — U.S. —, 118 S.Ct. 586, 139 L.Ed.2d 423 (1997). Although courts retain some discretion to revisit issues decided by prior panels, this discretion is limited. *See Thomas v. Bible,* 983 F.2d 152, 155 (9th Cir.1993). "[T]he prior decision of legal issues should be followed on a later appeal 'unless (1) the evidence on a subsequent trial was substantially different, (2) controlling authority has since made a contrary decision of the law applicable to such issues, or (3) the decision was clearly erroneous and would work a manifest injustice.'" *Kimball v. Callahan,* 590 F.2d 768, 771–72 (9th Cir.1979) (quoting *White v. Murtha,* 377 F.2d 428, 431–32 (5th Cir.1967)) (enumeration added).

Plunk apparently contends that the Supreme Court's recent decision in *United States v. Ursery,* 518 U.S. 267, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996)—which was handed down after this court's decision in *Plunk I*—constitutes intervening controlling authority that justifies a departure from traditional law-of-the-case principles. In *Ursery,* the Court held that, as a general matter, *"in rem* civil forfeitures are neither 'punishment' nor criminal for purposes of the Double Jeopardy Clause." *Id.* at 292, 116 S.Ct. 2135. In making his argument for reversal under *Ursery,* Plunk emphasizes two aspects of the Court's decision. First,

---

**19.** Citation of the unpublished disposition is appropriate for purposes of establishing the law of the case. *See* Ninth Circuit R. 36–3.

he points to the Court's distinction between *in rem* civil forfeiture proceedings, which are purely remedial and therefore do not give rise to a double jeopardy bar, and *in personam* civil penalties, which are often punitive and thus can give rise to such a bar. Second, he points to a footnote in which the Court suggested that even some *in rem* civil forfeitures could constitute "punishment" for double jeopardy purposes: "[W]here the 'clearest proof' indicates that an in rem civil forfeiture is 'so punitive either in purpose or effect' as to be equivalent to a criminal proceeding, that forfeiture may be subject to the Double Jeopardy Clause." *Id.* at 289 n. 3, 116 S.Ct. 2135. Relying on these two portions of *Ursery,* Plunk contends that because "factually, tactically, statutorily, and procedurally, the subject administrative forfeitures ... were in fact in personam criminal forfeitures tactically directed at [him] to punish him," he is entitled to the protection of the Double Jeopardy Clause against further prosecution.

The *Ursery* decision does not, however, fit within the narrow exception to the law-of-the-case doctrine for "contrary decision[s]" of "controlling authorit[ies]." *Kimball,* 590 F.2d at 772. Although the United States Supreme Court is, no doubt, a "controlling authority," its decision in *Ursery* was in no way "contrary" to *Plunk I. Plunk I* was decided on the ground that Plunk's failure to "assert any claim to the seized property," as authorized by 19 U.S.C. § 1608, deprived him of "any right he had to" it. *Plunk I,* 1995 WL 619299, at *1. This, in turn, defeated any claim under the Double Jeopardy Clause. *See id. Ursery* neither spoke to this issue, nor did its holding affect it. Under well-established law-of-the-case doctrine, we therefore may not revisit Plunk's double jeopardy claim. *See Kimball,* 590 F.2d at 772.

## X

Plunk has raised numerous challenges to the district court's decision, but to no avail. For the foregoing reasons, we decline to disturb either Plunk's convictions or his sentence.

**AFFIRMED.**